1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6  NATHAN S. TREAT,

7                              Plaintiff,

8          v.

9  MICHAEL J. ASTRUE, Commissioner of
   Social Security,

10

11                          Defendant.

Case No. C09-5095RJB-KLS

REPORT AND RECOMMENDATION

Noted for April 2, 2010

12
13
14        Plaintiff, Nathan S. Treat, has brought this matter for judicial review of the denial of his

15  application for supplemental security income ("SSI") benefits.  This matter has been referred to

16  the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR

17  4(a)(4) and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>, 423 U.S. 261 (1976).

18  After reviewing the parties' briefs and the remaining record, the undersigned submits the

19  following Report and Recommendation for the Court's review.

20

21                  <u>FACTUAL AND PROCEDURAL HISTORY</u>

22        Plaintiff currently is 25 years old.[1] Tr. 53.  He has a general equivalency degree as well as

23  an associate degree in both English and social studies, and no past relevant work experience. Tr.

24  34, 67, 388-89.

25

26        [1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding
    Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference
    of the United States.

REPORT AND RECOMMENDATION - 1

On December 23, 2004, plaintiff filed an application for SSI benefits, alleging disability as of December 14, 1984, due to epilepsy and a bipolar disorder. Tr. 25, 66. His application was denied initially and on reconsideration. Tr. 25, 53-54, 56. A hearing was held before an administrative law judge ("ALJ") on October 1, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 385-408.

On November 26, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1) at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since the date he filed his application for SSI benefits;

(2) at step two, plaintiff had "severe" impairments consisting of a seizure disorder, an organic mental disorder and depression;

(3) at step three, none of plaintiff's impairments met or medically equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) after step three but before step four, plaintiff had the residual functional capacity to perform the full range of work at all exertional levels, but with certain additional non-exertional limitations;

(5) at step four, plaintiff had no past relevant work; and

(6) at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 25-35. Plaintiff's request for review was denied by the Appeals Council on December 16, 2008, making the ALJ's decision the Commissioner's final decision. Tr. 6; 20 C.F.R. § 416.1481.

On February 19, 2009, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3). The administrative record was filed with the Court on May 22,

---

[2] The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

2009. (Dkt. #10). Plaintiff argues the ALJ's decision should be reversed and remanded to the Commissioner for an award of benefits or, in the alternative, for further administrative proceedings for the following reasons:

> (a)　the ALJ erred in evaluating the medical evidence in the record;
>
> (b)　the ALJ erred in assessing plaintiff's credibility;
>
> (c)　the ALJ erred in evaluating the lay witness evidence in the record;
>
> (d)　the ALJ erred in assessing plaintiff's residual functional capacity; and
>
> (e)　the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation

omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A.      Dr. Harrison, Dr. Krueger and Dr. Neims

Katherine S. Harrison, Psy.D., competed a psychological/psychiatric evaluation form in early December 2004, in which she diagnosed plaintiff with a bipolar disorder. Tr. 376.  Based on that diagnosis, Dr. Harrison found he had a marked limitation (defined as a "[v]ery significant interference with basic work-related activities") in his ability to:

- exercise judgment and make decisions;
- relate appropriately to co-workers and supervisors;
- interact appropriately in public contacts; and
- respond appropriately to and tolerate the pressures and expectations of a normal work setting.

Tr. 375, 377.  She also found plaintiff had a moderate limitation (defined as "[s]ignificant in[ter]ference with basic work-related activities") in his ability to:

REPORT AND RECOMMENDATION - 5

- understand, remember and follow complex (i.e., "more than two step") instructions;
- learn new tasks;
- perform routine tasks; and
- care for himself, including personal hygiene and appearance.

Id. Dr. Harrison estimated plaintiff would be so limited for at least 12 months, but opined that he "may not be interested in or cooperative with treatment." Tr. 378.

Another such form was completed in late January 2006, by Keith Krueger, Ph.D., who diagnosed plaintiff with a bipolar disorder, not otherwise specified ("NOS"), along with two other possible diagnoses consisting of a cognitive disorder, NOS, and a borderline personality disorder. Tr. 368. He found plaintiff to be markedly limited in his ability to:

- relate appropriately to co-workers and supervisors;
- interact appropriately in public contacts; and
- respond appropriately to and tolerate the pressures and expectations of a normal work setting;

Tr. 369. Dr. Krueger also found plaintiff to be moderately limited in his ability to:

- exercise judgment and make decisions;
- perform routine tasks; and
- control physical or motor movements and maintain appropriate behavior.

Id. However, Dr. Krueger believed that mental health intervention was likely to restore or substantially improve plaintiff's ability to work for pay in a regular and predictable manner, and, indeed, commented that he had "better" cognitive functioning than when evaluated in December 2004. Tr. 370. Nevertheless, Dr. Krueger still felt plaintiff was likely to remain impaired to the extent noted above for at least 12 months. Id.

Daniel M. Neims, Psy.D., also completed the same evaluation form in early November 2006, in which he diagnosed plaintiff with a bipolar disorder, NOS, by history, and two other

REPORT AND RECOMMENDATION - 6

possible diagnoses consisting of a cognitive disorder, NOS, and a rule out mood disorder. Tr.

360. Dr. Neims opined that plaintiff was markedly limited in his ability to:

- relate appropriately to co-workers and supervisors;
- interact appropriately in public contacts; and
- respond appropriately to and tolerate the pressures and expectations of a normal work setting.

Tr. 362. He further opined that plaintiff was moderately limited in his ability to:

- learn new tasks;
- exercise judgment and make decisions;
- perform routine tasks;
- care for himself, including personal hygiene and appearance; and
- control physical or motor movements and maintain appropriate behavior.

Id. As did Dr. Krueger, Dr. Neims believed that mental health intervention was likely to restore

or substantially improve plaintiff's ability to work for pay in a regular and predictable manner,

but that he still was likely to be limited to the above extent for at least 12 months. Tr. 363.

After summarizing the findings and opinions from Drs. Harrison, Krueger and Neims (Tr.

29-30), the ALJ found as follows:

> In December 2004, Dr. Harrison stated that the claimant had marked limitations. In January 2006, Dr. Krueger stated that the claimant had marked limitations. In November 2006, Dr. Ne[i]ms stated that [t]he claimant had marked limitations. Each assessment form states, "Assistance for this individual is being held pending receipt of this information." (Exhibit 18F) Apparently, they all found the claimant to be ineligible for assistance, despite his marked limitations. As each assessment was for the purpose of gaining assistance, the claimant would have been motivated to present a "worst case" scenario. There is little indication that any of the physicians reviewed the claimant's treatment records. As the undersigned has already found the claimant to be less than credible, the undersigned gives little weight to these assessments.

Tr. 33-34. Plaintiff argues the ALJ erred in so finding. The undersigned agrees.

The ALJ appears to place much reliance on the fact that each of the evaluation forms Dr.

Harrison, Dr. Krueger and Dr. Neims completed contains the following pre-printed statement:

REPORT AND RECOMMENDATION - 7

"ASSISTANCE FOR THIS INDIVIDUAL IS BEING HELD PENDING RECEIPT OF THIS INFORMATION." See Tr. 358, 367, 375. The ALJ then goes on to note that all three examining psychologists found plaintiff "to be ineligible for assistance, despite his marked limitations." Tr. 34. But, as pointed out by plaintiff, by checking the relevant box indicating such ineligibility, they in fact were merely stating that plaintiff was not eligible to receive treatment from their own agencies. See Tr. 363, 370, 378. Thus, it is not reasonable to infer that by checking this box, any of the three psychologists was finding plaintiff ineligible for disability assistance based either on the medical evidence in the record or on their own clinical findings.

In addition, while it may be true that "[t]here is little indication that any of the" three examining psychologists reviewed plaintiff's treatment records (Tr. 34), as examining physicians they were not required to do so. Indeed, the Commissioner himself often relies on such one-time evaluations to determine claimants' ability to perform work-related activities and eligibility for disability benefits, whether or not the examining medical sources who perform such evaluations also have reviewed other medical evidence in the record. Nor does the ALJ point to any specific treatment records that contradict the findings of the three psychologists here.

Similarly improper was the ALJ's finding that because the evaluations were "for the purpose of gaining assistance," plaintiff "would have been motivated to present a 'worst case' scenario." Id. That is, the mere fact that because a claimant may have been seen by a medical source for the purpose of determining eligibility for disability benefits, does not alone constitute evidence of improper motive or secondary gain issues. Again, as with one-time examinations, the Commissioner often sends claimants for evaluations for the purpose of determining their ability to perform work-related activities, which often forms the basis for the Commissioner's subsequent disability determination.

Defendant insists the ALJ did not err here, because earlier in his decision he noted that while plaintiff persisted in pursuing eligibility for disability benefits based on his mental health condition, he lacked such persistence in pursuing ongoing treatment therefor. But although, as explained below, this may be a proper basis for discounting plaintiff's credibility regarding his subjective complaints and limitations overall, it does not necessarily mean plaintiff engaged in malingering or factitious behavior at any of the evaluations. For example, none of the medical sources appear to have questioned plaintiff's honesty or pointed to other evidence of untruthful behavior at the time. In addition, the ALJ did not specifically link the two in his decision. As such, the undersigned does find that this stated basis for rejecting the opinions of the medical sources appears to be much closer to a negative generalization about disability claimants, than it is to a valid determination supported by facts specific to this case.

Lastly, it is true that a medical source's opinion premised on a claimant's subjective complaints may be discounted where the record supports the ALJ in discounting the claimant's credibility. See Tonapetyan, 242 F.3d at 1149; see also Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999) (opinion of physician premised to large extent on claimant's own accounts of her symptoms and limitations may be disregarded where those complaints have been properly discounted). Here, though, each medical source – in addition to considering plaintiff's history and subjective complaints – performed a mental status examination, which in itself forms a proper basis for a medical diagnosis. See Tr. 358, 360, 362, 364-66, 368, 371-72, 375-77; Clester v. Apfel, 70 F.Supp.2d 985, 990 (S.D. Iowa 1999) (results of mental status examination provide basis for diagnostic impression of psychiatric disorder, just as results of physical examination do for diagnosis of physical illness or injury).

Defendant argues the ALJ did not actually reject the findings of Drs. Harrison, Krueger and Neims, but instead gave them less weight. Actually, as noted above, the ALJ in fact stated he was giving them "little" weight, which in this case is hardly any different from assigning them "no" weight. For example, while each of the examining psychologists found plaintiff had multiple marked mental functional limitations, the ALJ apparently declined to adopt them, as none seem to have been included in plaintiff's assessed residual functional capacity. See Tr. 28. It also appears the ALJ declined to include therein all but perhaps one of the moderate limitations those medical sources found as well.

The undersigned further finds unpersuasive defendant's assertion that the ALJ found the marked limitations noted by Dr. Harrison, Dr. Krueger and Dr. Neims, to be inconsistent with their clinical findings. Nowhere in the ALJ's decision does he state this as a reason for rejecting those limitations. Nor – even if such a basis for rejecting them could be implied therein – does defendant himself point to any such inconsistencies in any of the evaluation forms completed by the above three medical sources. Accordingly, this appears to be an improper *post hoc* rationale defendant is employing here. See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (finding error to affirm credibility determination based on evidence ALJ did not discuss).

B.    Dr. Price

In mid-March 2005, plaintiff underwent a psychiatric evaluation performed by Richard Price, M.D., who diagnosed him with a rapid cycling bipolar disorder, mixed personality traits and a global assessment of functioning ("GAF") score of 50 to 55.[3] Tr. 223. In terms of both plaintiff's prognosis and his functional capabilities, Dr. Price opined as follows:

---

[3] "[A] GAF score of 50 "reflects serious limitations in an individual's general ability to perform the basic tasks of daily life." England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007) (citation omitted). "A GAF of 51-60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'"

REPORT AND RECOMMENDATION - 10

. . . The claimant has significant degree of mood instability, which probably best fits the diagnosis of bipolar disorder. He also has a history that suggests conduct disorder and there are some persistent signs of difficulty in coping with authority type figures. He is receiving a mood stabilizer, which probably helps stabilize his mood; however, he feels very sedated on it. He would probably benefit from further medication trials to find something that controls his mood instability and seizure disorder without the significant sedation.

I believe it is unlikely that he will stabilize to the point of employability within 12 months, but it is difficult to predict at this time whether he will mature to a point of being responsible and socially effective.

. . . The claimant seems quite capable of managing his funds and does so. He is able to perform simple and repetitive tasks and may be able to do detailed and complex tasks. If he were employed, I believe he would have trouble accepting instructions from supervisors and interacting with co-workers and the public. I do believe that if he were motivated, he could perform work activities consistently if his medication could be effectively managed.

Tr. 223-24.

In regard to Dr. Price's opinion, the ALJ found as follows:

Dr. Price stated that it was unlikely that the claimant would stabilize to the point of employability in the next 12 months, and that the claimant could perform work activities if his medication could be effectively managed and he was motivated. Such statements seem somewhat inconsistent. Given the claimant's many activities, and that the undersigned has already found the claimant to be less than credible, the undersigned gives greater weight to Dr. Price's second statement.

Tr. 34. Plaintiff argues the ALJ here too provided improper reasons for rejecting the opinion of this examining medical source. Again, the undersigned agrees. First, as noted by plaintiff, there is no necessary inconsistency in the two statements pointed out by the ALJ. That is, it certainly is plausible that Dr. Price felt effective medication management might not be achieved within the subsequent 12-month period. Read this way, no inconsistency exists here. Although it is solely the responsibility of the ALJ to resolve any conflicts or ambiguities in the evidence, the ALJ may

_____

Tagger v. Astrue, 536 F.Supp.2d 1170, 1173 n.6 (C.D.Cal. 2008) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34).

REPORT AND RECOMMENDATION - 11

not himself create any such conflict or ambiguity not already there. It also is not exactly clear as to what the ALJ meant by "somewhat" inconsistent, which implies the ALJ felt those statements were not <u>entirely</u> inconsistent with each other.

In addition, while it may be, as explained below, that the type and number of activities plaintiff engaged in bear adversely on his credibility, again the ALJ fails to explain in any detail how those activities call into question Dr. Price's findings. Indeed, plaintiff told Dr. Price that he engaged in such activities as going to school, doing artwork, playing music, doing chores, and going shopping by himself. Tr. 222. Accordingly, Dr. Price was well aware of these activities at the time he completed his evaluation report. The primary issues plaintiff was noted by Dr. Price to have, furthermore, concerned social functioning (Tr. 223-24), which do not necessary conflict with an ability to perform plaintiff's stated activities.

Finally, as in the case with the other medical sources discussed above, although a medical source's opinion premised largely on a claimant's subjective complaints may be discounted where the record supports the ALJ in discounting the claimant's credibility (<u>see</u> <u>Tonapetyan</u>, 242 F.3d at 1149; <u>Morgan</u>, 169 F.3d at 601), here Dr. Price both considered plaintiff's history and performed a mental status examination, the latter of which alone constitutes a proper basis for the medical diagnoses and clinical findings obtained. Tr. 220-23; <u>see</u> <u>Clester</u>, 70 F.Supp.2d at 990. As such, the ALJ erred in rejecting Dr. Price's opinion concerning plaintiff's mental functional limitations and ability to perform work-related activities.

C.     <u>Dr. Peterson and Dr. Clifford</u>

A psychiatric review technique form was completed by Anita M. Peterson, Ph.D., in late March 2005, and affirmed by Thomas Clifford, Ph.D., in late August 2005, in which they diagnosed plaintiff with an organic mental disorder, an affective disorder consisting of a bipolar

syndrome and a mixed personality disorder. Tr. 229-30, 232, 236. Based on those diagnoses, Drs. Peterson and Clifford found plaintiff had a moderate restriction in his activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration. Tr. 239.

In a mental residual functional capacity assessment form once more also completed by Dr. Peterson in late March 2005, and affirmed by Dr. Clifford in late August 2005, they found more specifically that plaintiff was moderately limited in his ability to:

- Understand, remember and carry out detailed instructions;
- maintain attention and concentration for extended periods;
- complete a normal workday and workweek without interruptions from psychologically based symptoms;
- perform at a consistent pace without an unreasonable number and length of rest periods;
- interact appropriately with the general public;
- accept instructions and respond appropriately to criticism from supervisors;
- get along with co-workers or peers without distracting them or exhibiting behavioral extremes;
- maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;
- respond appropriately to change in the work setting; and
- set realistic goals or make plans independently of others.

Tr. 225-26. In a narrative portion of that form, Drs. Peterson and Clifford opined that plaintiff's activities of daily living indicated he was "capable of some work," and that as long as he was compliant with his medications, he would remain capable of performing work that required no "sustained close focus." Tr. 227. They further opined as follows:

. . . He can persist at 3-step tasks that interest him on a regular basis.
. . . He can work with a supervisor who is tolerant of his profanity. Although he may be angry or inappropriate at times, he usually can interact with coworkers without significant conflict.
. . . Adaptive skills are affected by impulsivity and poor judgment, but are adequate when he is motivated to adjust to a work situation. He can make major decisions with guidance, but is unlikely to seek it at this time.

REPORT AND RECOMMENDATION - 13

Id.

In his decision, after providing his reasons for rejecting the findings and opinions of Drs. Harrison, Krueger, Neims and Price, the ALJ stated that he was giving "greater weight to the opinions of" Dr. Peterson and Dr. Clifford, noting that "[t]hey found only moderate limitations." Tr. 34. Plaintiff argues that to the extent the opinions of Drs. Peterson and Clifford differed from those of the examining medical sources noted above, they do not constitute substantial evidence justifying the rejection of the latter. Defendant argues the opinions of Dr. Peterson and Dr. Clifford do constitute substantial evidence, as they relied on different evidence than did the other medical sources, namely their review of the medical evidence.

But this was not a reason the ALJ put forth as a basis for preferring the opinions of those two non-examining psychologists. In addition, the only medical record specifically referred to in the forms Drs. Peterson and Clifford completed appears to be Dr. Price's evaluation report. See Tr. 227. Indeed, there is no indication anywhere in those forms as to how much of the medical or other evidence in the record Dr. Peterson and Dr. Clifford in fact reviewed, let alone whether they actually reviewed the whole thereof as asserted by defendant. In addition, as can be seen from the above discussion, Dr. Price found more severe limitations in at least some areas of mental functioning than did Drs. Peterson and Clifford. As such, it cannot be said with any certainty that the opinions Dr. Peterson and Dr. Clifford provided were based on independent evidence in the record, and thus that they constitute substantial evidence.

The undersigned further rejects defendant's other assertion that the ALJ gave greater weight to the findings of Dr. Peterson and Dr. Clifford, because they were more consistent with Dr. Price's second statement that plaintiff could perform work activities if his medication could be effectively managed and he was motivated. First, the ALJ did not state this as a basis for

giving more weight to those findings.  Indeed, he gave no reason at all, merely stating he was doing so due to the moderate limitations they found.  Second, given that the ALJ asserted no valid reasons for rejecting the more severe functional limitations found by Dr. Price, even if the ALJ had made the assertion put forth by defendant here, that would be invalid too.

D.  <u>Dr. Sharangpani, Dr. Doherty and Dr. Miller</u>

In early March 2005, Ritawari Sharangpani, M.D., noted that plaintiff seemed "to be manic" based on an "abusive" telephone message he left. Tr. 207.  In late June 2005, plaintiff told Michael J. Doherty, M.D., that since their last visit, he had "had several breakthrough events of visual changes and slight confusion," albeit "less so" due to an increase in his medication. Tr. 245.  In early October 2005, plaintiff complained to James M. Miller, M.D., that he was "not sleeping." Tr. 269.  Plaintiff argues the ALJ erred by failing to state any reason for discrediting the opinions of these three medical sources.

None of the above medical evidence, however, contains a relevant medical opinion the ALJ was required to address.  Indeed, the only "opinions" Drs. Doherty and Miller relayed were what plaintiff had reported to them.  However, subjective complaints – particularly those from a claimant whose credibility, as is the case here as discussed below, properly has been discounted by the ALJ – hardly constitutes objective medical evidence.  As for Dr. Sharangpani's comment that plaintiff seemed to be manic by way of the telephone message he left, while it may describe plaintiff's perceived state of mind at the time, there is no indication Dr. Sharangpani felt any significant work-related limitations were caused thereby.  Accordingly, the undersigned finds no error on the part of the ALJ here.

1

E.    Ms. Davis and Mr. Zunino

2

In late February 2006, plaintiff told Patricia Davis, A.R.N.P., he experienced "difficulty

3

processing" things mentally and did "not feel mentally sharp," due to his medications. Tr. 348.

4

In late March 2007, plaintiff told Bud Zunino, A.R.N.P., that he "had lost the will to live" and

5

that he "just feels lost," although he was not suicidal. Tr. 331.  In late May 2007, plaintiff left a

6

telephone message for Mr. Zunino, in which he stated that he had lost his "script" for his anti-

7

depressant medications, that he had been out of them for two days, and that he was "feeling

8

suicidal." Tr. 317.  In early June 2007, plaintiff reported to Ms. Zunino that he was "very sleepy"

9

and that he lacked motivation. Tr. 326.

10

Plaintiff argues the ALJ had a duty to properly evaluate the above "other source medical

11

opinion evidence" (Dkt. #15, p. 18), and erred by failing to state any reason for not adopting it.

12

But this argument fails for the same reason plaintiff's argument concerning Drs. Sharangpani,

13

Doherty and Miller failed.  That is, this evidence contains no relevant medical source opinions,

14

but instead just relates what plaintiff reported regarding his symptoms.  As such, given that the

15

ALJ did not err in discounting his credibility as discussed below, he was not required to address,

16

let alone adopt any of those reports.  Accordingly, here too the ALJ did not err.

17

II.    The ALJ's Assessment of Plaintiff's Credibility

18

Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker,

19

694 F.2d 639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility

20

determination.  Allen, 749 F.2d at 580.  In addition, the Court may not reverse a credibility

21

determination where that determination is based on contradictory or ambiguous evidence.  Id. at

22

579.  That some of the reasons for discrediting a claimant's testimony should properly be

23

24

25

26

REPORT AND RECOMMENDATION - 16

discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

Plaintiff argues the ALJ provided an improper credibility determination in this matter. Specifically, plaintiff asserts that after summarizing his testimony, the ALJ merely stated that "[a]fter considering all of the evidence," plaintiff's "allegations" were "not credible," but he did not identify in what way plaintiff was not credible nor did he set forth the evidence supporting that conclusion. Tr. 32. Plaintiff's assertion here, however, is wholly without merit. For example, beginning on the page immediately prior to the page containing the above finding, the ALJ stated in relevant part:

The claimant has not maintained ongoing treatment for mental impairments. In August 2004, the claimant insisted to Dr. [Sarah E.] Stolz that he did not have a mood disorder. He had not established a treatment relationship with a psychiatrist. The claimant was treated by Dr. Sharangpani for only a few months. In July 2007, the claimant told BigRock [Health Clinic] that he was doing well on the 112.5 mg. dose or Effexor. It may be that the claimant's mental impairment at times leads him to believe he has no mental impairment, or does not need treatment. However, the claimant has filed for SSI and been examined by [the Washington State Department of Social and Health Services] three times. Apparently, the claimant does believe that he has a mental impairment when it comes to receiving financial assistance. If the claimant were as disabled as he alleges when seeking assistance, one would expect him to seek treatment as well.

. . . The claimant has not sought alternative forms of treatment.

Tr. 31-32. Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989); see also Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) (upholding ALJ discounting credibility in part due to lack of consistent treatment, and noting fact that claimant's pain was not sufficiently severe to motivate her to seek treatment, even if she had sought some treatment, was powerful evidence regarding extent to which she was in pain). Meanal v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered physician's failure to prescribe, and claimant's failure to request serious medical treatment for supposedly excruciating pain); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ properly found prescription for conservative treatment only to be suggestive of lower level of pain and functional limitation).

It is true that the fact that a claimant does "not seek treatment for a mental disorder until late in the day" is a questionable basis on which to find the claimant not credible regarding that condition. Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (noting those with depression often do not recognize their condition reflects potentially serious mental illness); Blankenship v.

*Bowen*, 874 F.2d 1116, 1124 (6th Cir.1989) (finding questionable practice of chastising one with mental impairment for exercise of poor judgment in seeking rehabilitation). Here, though, there is little evidence to suggest plaintiff's mental condition – or other valid reason, such as a lack of financial resources – was what prevented him from seeking such treatment. See 139, 149, 157, 252, 318, 323-24, 330-31, 340, 353-54, 378. Also reasonable is the ALJ's presumption that one who seeks financial assistance based on a mental impairment, would also be aware enough of the impairment to seek proper treatment therefor.

      The ALJ further discounted plaintiff's credibility in part for the following reasons:

> The frequency of the claimant's seizures has decreased since his surgery. In February 2005, Dr. Doherty noted that the claimant had not had any convulsive seizures since his surgery. The claimant eventually was able to stop taking Depakote all together. The claimant testified that he had had a seizure recently only because he stopped taking his medication. . . .

Tr. 32; see also Tr. 138, 143, 149, 207, 221, 223, 245, 247-50, 252, 270, 320-21, 327-29, 332-33, 335, 342, 344, 346, 348, 370. These reasons too provided a valid basis for finding plaintiff not fully credible. See *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (proper to discount claimant's credibility due to medical improvement); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).

      Lastly, the ALJ found as follows in regard to plaintiff's activities:

> In November 2006, the claimant stated that he had earned an A.A. degree. At the time, the claimant was one month short of his 22nd birthday. In March 2005, the claimant told Dr. Price that he was about to finish his work in social arts and general studies. Apparently, the claimant earned an A.A. degree between March 2005 and November 2006. Although it apparently took the claimant several years to obtain an A.A. degree, the claimant told Dr. Harrison that he was taking elective college classes because he did not want to finish. The slow progress in the A.A. degree apparently was not due to the claimant's impairments. In September 2004, Dr. [Alan] Haltiner observed that the claimant's I.Q. subtest scores range from high average to superior.

    . . .

REPORT AND RECOMMENDATION - 19

> Despite the claimant's impairments, he has a wide range of activities. He attended college classes, eventually earning an A.A. degree. In January 2007, the claimant stated that he was running for Student Body President. At the hearing, the claimant testified that he played several musical instruments, went to "open mike" on Thursdays, and went to concerts. . . .

Tr. 32. Earlier in his decision, the ALJ also pointed to the following additional activities plaintiff reported engaging in:

> . . . He was online one to two hours a day to visit "My Space." He also spent time online doing research for school. He had salt water fish that he cared for well, but they had died when there was a power failure. He had three weasels and a house dog as pets. He went to concerts because that was where everyone went. . . . He played keyboard, bass guitar, piano, and trumpet. He had gone on two long trips in 2006 and 2007 to the beach in Oregon and to visit family with his father.

Tr. 31. To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

The above activities do show plaintiff has been active at a level far above that which has been claimed in this case. Thus, this too constituted a valid basis for discounting the credibility of plaintiff. In his reply brief, plaintiff states he has not directly challenged any of the ALJ's above-stated reasons for finding him to be not fully credible, but claims this is because those reasons are difficult to discern, are dispersed throughout the ALJ's decision and are not clearly linked to his own testimony. But as can be seen from the above discussion, this is not at all the case, and plaintiff's claim is therefore rejected.

REPORT AND RECOMMENDATION - 20

III.   The ALJ's Evaluation of the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Id. at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

The record contains a completed questionnaire from plaintiff's father, in which he sets forth his observations regarding plaintiff's symptoms and limitations. See Tr. 77-85. The ALJ addressed those observations as follows:

> On January 16, 2005, Vern Treat, the claimant's father, stated that the claimant was attending two college classes a week. The claimant played music on Thursday evenings at the Matrix Coffee House. The claimant sometimes slept up to 18 hours a day, probably because of the large doses of medication he was taking. The claimant did not always remember to eat until he was famished. The claimant did not need any special reminders to take care of personal needs or grooming. Mr. Treat gave the claimant his medication because the claimant did not take it consistently on his own. The claimant was able to prepare his own meals, but he did not always do so. The claimant could do "everything" when it came to indoors and outdoors household chores, but he usually did nothing. The claimant needed to be told to do things or he did not do them at all. The claimant was capable intellectually, but was not mature enough to pay bills and handle a bank account. The claimant visited friends daily. The claimant seemed calmer since his surgery. The claimant had a very good attention span when he was not tired. The claimant usually responded oppositionally to authority figures and was argumentative. (Exhibit 4E).

> Although Mr. Treat stated that the claimant slept up to 18 hours a day, the treatment records contain little mention of it. If the sleep was due to the high level of medications, it would appear that the sleep levels may have dropped when the medication levels dropped. Mr. Treat stated that the claimant could

do "everything" when it came to chores, but he usually did nothing.  Unless the claimant's choice to do "nothing" is shown to be part of his impairment, little weight is given to this statement.  The claimant is able to attend concerts, play music at a coffee house, and attend college classes.  Dr. Price stated that the claimant could perform work activities consistently if he were "motivated."  Apparently, the claimant is not motivated to perform chores.  The undersigned gives more weight to Mr. Treat's description of the claimant's activities, and less weight to his interpretation as to the cause of the claimant's behavior.

Tr. 33.  Plaintiff argues the ALJ erred by not fully crediting his father's statements, but does not explain with any specificity how the ALJ supposedly erred here.  Rather, the undersigned finds the ALJ provided germane reasons for giving greater weight to the statements made by plaintiff's father that indicate an ability to engage in a significant range of activities, and not to any alleged need, for example, to sleep for up to 18 hours a day or inability to work.

The record also contains a letter, dated September 14, 2007, from the Dean of Student Services for the college plaintiff was attending at the time, notifying him that he had violated the student conduct code by obstructing or disrupting school functions, refusing to comply with reasonable requests or directions to leave an area or a building by school officials, and engaging in harassment, including sexual harassment. Tr. 128-29.  Plaintiff was suspended immediately, and was told he could petition for return "pending successful completion" of all of the following requirements:

1.    Comprehensive Mental Health Assessment by a licensed psychologist or psychiatrist stating that [he is] safe to self and with others.
2.    Completion of anger managment [sic] classes or documentation from licensed therapist indicating successful completion of therapy addressing anger management.
3.    Provide consent to talk with the health care providers in above requirements, i.e. outcomes of assessment and anger management.

Tr. 128.

REPORT AND RECOMMENDATION - 22

Plaintiff argues that while the ALJ acknowledged this letter and summarized its contents, he did not explain what weight, if any, he was giving to it. But the ALJ was not required to do so, since an ALJ "need not discuss all evidence presented" to him or her, but must only explain why "significant probative evidence has been rejected." Vincent, 739 F.3d at 1394-95. At most, the above letter indicates plaintiff was involved in some sort of incident requiring his expulsion from school and participation in mental health treatment, including anger management, in order to petition for re-admission. Although this does indicate plaintiff has potential issues with anger, it contains no evidence concerning the presence of any specific work-related limitations. That is, there is nothing in the letter to suggest, for example, that plaintiff would have trouble in a work setting. The ALJ thus did not err in failing to assign any weight to the letter.

IV.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the

claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

In this case, the ALJ found in relevant part as follows:

**. . . [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he must avoid hazards such as heights and dangerous moving machinery; he can perform only simple, routine, repetitive tasks; he can perform jobs that require occasional public contact; he cannot perform jobs that require high production quotas.**

Tr. 28 (emphasis in original). Plaintiff argues this residual functional capacity assessment is erroneous, because the ALJ erred in evaluating the medical evidence and lay witness evidence in the record and in assessng plaintiff's credibility. As discussed above, though, the ALJ did not err in evaluating the lay witness evidence or in assessing plaintiff's credibility.

On the other hand, also as discussed above, the ALJ did err in evaluating the findings and opinions of Drs. Harrison, Krueger, Neims, and Price. In addition, the undersigned agrees with plaintiff that while the ALJ stated he was giving "greater weight" to the several moderate mental functional limitations found by Drs. Peterson and Clifford, he appears not to have adopted all of them. For example, they found plaintiff to be so limited in his ability to maintain attention and concentration for extended periods, complete a normal workday and workweek, get along with co-workers, accept instructions from supervisors, and set realistic goals. Tr. 225-26. It cannot be said with any certainty, therefore, that the ALJ's assessment of plaintiff's residual functional capacity is entirely accurate. Accordingly, the undersigned finds erred here.

V.      The ALJ's Step Five Analysis

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20

REPORT AND RECOMMENDATION - 24

C.F.R. § 416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids").  Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ.  Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence.  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record."  Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that description those limitations he or she finds do not exist.  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the hearing, the ALJ posed a hypothetical question to the vocational expert, containing substantially the same functional limitations as were included in plaintiff's RFC assessment. Tr. 406-07.  In response to that question, the vocational expert testified that an individual with the same age, education, past work experience, and residual functional capacity as plaintiff, would be able to perform other jobs in the national economy. Tr. 407.  Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other jobs existing in significant numbers in the national economy. Tr. 34-35.

Plaintiff argues the ALJ erred in posing the above hypothetical question, because it does not contain all of his functional limitations.  For the same reasons discussed above in relation to his residual functional capacity assessment, the undersigned agrees.  The undersigned, however, disagrees that the substantial evidence in the record necessarily supports a limitation concerning the need to sleep for 12 or more hours per day or to take three hour naps due to the side effects of

his medications, as explained above by the ALJ. Similarly, it also is not at all clear that the ALJ was required to adopt the vocational expert's testimony that someone who cannot reliably make it to work on time two or more days per month would be unable to sustain employment. Rather, remand for further administrative proceedings regarding step five is needed.

VI.    This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain with respect to the medical evidence in the record, plaintiff's residual functional capacity and his ability to perform other jobs existing in significant numbers in the

REPORT AND RECOMMENDATION - 26

national economy at step five, this matter should be remanded to the Commissioner for further administrative proceedings.

Plaintiff argues that in light of the ALJ's errors in evaluating the findings and opinions of Drs. Harrison, Krueger, Neims, and Price, those findings and opinions should be credited as a matter of law. It is true that where the ALJ has failed "to provide adequate reasons for rejecting the opinion of a treating or examining physician," that opinion generally is credited "as a matter of law." Lester, 81 F.3d at 834 (citation omitted). However, where the ALJ is not required to find the claimant disabled on crediting of evidence, this constitutes an outstanding issue that must be resolved, and therefore the Smolen test will not be found to have been met. Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003). Further, "[i]n cases where the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence," the Ninth Circuit "consistently [has] remanded for further proceedings rather than payment of benefits." Bunnell, 336 F.3d at 1116. Such is the case here.

<u>CONCLUSION</u>

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).

REPORT AND RECOMMENDATION - 27

Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **April 2, 2010**, as noted in the caption.

DATED this 5th day of March, 2010.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 28